

# COURT OF APPEALS
# EIGHTH DISTRICT OF TEXAS
# EL PASO, TEXAS

---

## No. 08-25-00029-CR

---

Ololade Shoetan, Appellant

v.

The State of Texas, Appellee

---

**On Appeal from the 331st District Court
Travis County, Texas
Trial Court No. D-1-DC-21-500171**

---

## MEMORANDUM OPINION[1]

A jury convicted Appellant Ololade Shoetan of one count of aggravated kidnapping and

one count of attempt to commit sexual assault. On appeal, Shoetan brings a variety of issues: he

---

[1] This case was transferred pursuant to the Texas Supreme Court's docket equalization efforts. Tex. Gov't Code § 73.001. We follow the precedent of the Third Court of Appeals to the extent it might conflict with our own. *See* Tex. R. App. P. 41.3.

claims the evidence is not legally sufficient to support his convictions; he contends the offenses charged against him violated constitutional protections against double jeopardy; he argues the trial court erred in denying a finding that would have reduced a punishment range from first to second degree; and last, he maintains the trial court erred in admitting evidence of a pretrial identification based on an overly suggestive photo array. We affirm the judgment of conviction as to attempt to commit sexual assault; we affirm in part the judgment of conviction as to aggravated kidnapping, and reverse and remand as to punishment only.

## I. BACKGROUND

A grand jury indicted Shoetan on one count of sexual assault and one count of aggravated kidnapping. Shoetan pleaded not guilty and the case proceeded to a jury trial. The complaining witness, R.R.,[2] testified that on June 11, 2021, she was scheduled to work a 5:00 p.m. shift at a Sonic restaurant. She did not have a car or a ride to work so she ordered a ride from Lyft. She placed the order at about 4:30 p.m. through the app on her phone. Once the Lyft ride arrived at her apartment, she soon received a notification. The screen displayed the name "Shoetan" for the driver, and a license plate number. She saw a white minivan with a license plate matching the notification on her phone. After R.R. confirmed the vehicle as her Lyft ride, she got into the vehicle and sat in the back seat behind the front passenger seat.

During the short ride, R.R. and Shoetan exchanged conversation. Shoetan then told R.R. that they should go on dates when she was off on Sunday. R.R. testified that she declined and started to feel uncomfortable. When they stopped at a stop light, R.R. told Shoetan that she could get out and walk from there. She explained that she was about a 10-minute walk from her work. In response, Shoetan told her: "No. Why would you want to walk from here? It's just right down

---

[2] We will refer to the complaining witness by her initials only to protect her privacy.

the street." He also told her to take off her facemask, which she wore as a safety precaution in accordance with Lyft recommendations.[3] R.R. tried to exit the vehicle by pulling on the van door, but it was locked. Shoetan continued to tell R.R. to take off her facemask because they were friends now. She testified that she took it off because, at that point, she knew she was not getting out of his vehicle. Shoetan sternly said to her: "The only way you can get out is if you get in the front seat. So[,] get in the front seat." Feeling scared, R.R. climbed into the front seat. She continued to try and open the door by pushing buttons and pulling the handle.

R.R. expected to be dropped off soon after the traffic light turned green. But Shoetan drove past her destination. Once he drove past Sonic, she asked him where he was going. He let her know he knew where he was and that he was familiar with the area. He added that he did not live too far from their location. He then made a right-hand turn into the Milan apartment complex. R.R. asked him what he was doing and ordered him to take her to work. He responded, "No, no, no. Let's get to know each other a little more." He parked in a shaded area toward the back of the apartment complex. Shoetan then "ended" the ride on the Lyft app.

As Shoetan faced R.R., he told her to relax. He said they were going to get to know each other. R.R. repeated that she wanted to go to work. Shoetan extended his arm around her shoulder and pulled her close to him. To redirect his attention, R.R. asked about the fragrance he wore. She tried again to open the door and leave but she could not. She considered whether she could find something to break the window so she could exit the car. At this point, she texted Gladys Cancela, her friend and supervisor, for help. As Shoetan noticed, he took her phone from her and placed it under his left leg.

_____

[3] The incident took place during the COVID-19 pandemic.

3

R.R. testified that Shoetan next moved his arm from around her shoulder, placed it inside her shirt, and groped her right breast. She grabbed his arm and asked him to take her to work. Although she resisted, Shoetan moved his arm from her breast to the inside of her leggings. She testified he had his hand on her vagina and put his finger or fingers inside her vagina. She told him "no," and repeated her request to take her to work. He removed his hand from her leggings and loosened his pants. He grabbed her arm and forced her to touch his penis. She tried to pull away, but he pulled her down by grabbing the back of her neck in an attempt to have her perform fellatio. When she resisted, he reacted angrily. He said: "You're going to make me wait 'till Sunday?" R.R. told him she never said she was going anywhere with him and again asked him to take her to work. He responded, "how cruel," complaining that she was "leaving [him] like this." He then buckled his pants angrily and started the car.

Shoetan then drove the two-to-three-minute drive to Sonic. On arrival, Shoetan pulled in and parked at the corner of the Sonic entrance. He unlocked the door but as he did he told R.R. to give him her number. At this point, Shoetan still had possession of R.R.'s phone. She believed it remained under his left leg. He tossed her phone onto the seat and told her to give him her number. She said her number was in the Lyft app already, but he insisted that she give it to him directly. He commented that "people give phony numbers on Lyft." As she gave him her number, he called her phone to confirm it. Shoetan then told her: "You can leave now."

As R.R. entered the Sonic, she met with Cancela, who she had tried to text. They both walked outside. Cancela testified that she asked R.R. what was wrong. Canela described that R.R. was shaking and revealed to her that her Lyft driver had touched her. Cancela found Shoetan's information from the Lyft app and called him. She told Shoetan that he should be ashamed of himself and said, "you touched her." She said Shoetan denied touching her and said he was in

4

downtown Austin. Cancela accused him of lying considering that he had just left the scene. Cancela then called 911. Law enforcement officers arrived and spoke with R.R. An officer testified that R.R. appeared visibly upset. R.R. told the responding detective that she was concerned about her safety because Shoetan knew where she lived and she thought the keys to her apartment were still in his car. Collecting evidence, the officers took pictures of R.R.'s wrists, the back of her neck, and the Lyft information displayed in the Lyft app of her phone. They also took the shirt and leggings she had been wearing at the time of the incident. Officers provided R.R. with information about undergoing a sexual assault forensic examination. R.R. felt scared and didn't want to be touched.

Days later, R.R. changed her mind. The State also introduced evidence of R.R.'s Sexual Assault Forensic Examination (SAFE) where she told the nurse her neck was sore and that she felt pain in her vagina. R.R. told the nurse that Shoetan digitally penetrated her vagina, touched her right breast, and forced her to touch his penis. R.R. described how she felt scared about being touched. She had showered, brushed her teeth, and changed her clothes multiple times before the SAFE exam was performed. No DNA evidence was recovered from the exam.

The State additionally introduced into evidence the photo array conducted in this case. The officer who administered the array testified that R.R. visibly reacted when she saw Shoetan's photo. He explained she turned her head away from the screen and confirmed that he was the man who kidnapped and assaulted her. Finally, the State introduced evidence of records obtained from Lyft identifying Shoetan as the driver that picked up R.R. The records showed the ride started at R.R.'s apartment, followed the route to Sonic, and then went to the Milan apartment complex where the ride was terminated.

Completing three verdict forms, the jury found Shoetan guilty of aggravated kidnapping, not guilty of sexual assault, and guilty of the lesser-included offense of attempted sexual assault.

After a punishment hearing, the trial court sentenced Shoetan to 20 years' imprisonment for the aggravated kidnapping conviction and 10 years' imprisonment for the attempted sexual assault, with the sentences running concurrently. This appeal followed.

## II. Issues on Appeal

Shoetan asserts four issues on appeal. First, he contends that the evidence is legally insufficient to sustain his conviction for the aggravated kidnapping charge because "there is no evidence that R.R. was secreted by" Shoetan. Second, he argues his two convictions violate double jeopardy protections because attempted sexual assault is a lesser-included offense "subsumed by the greater offense of aggravated kidnapping." Third, he maintains that the trial court erred when it denied his request for a finding that he dropped R.R. off at a safe place, and the finding would have lowered the aggravated kidnapping conviction from a first-degree felony to a second-degree felony. And finally, he argues that the trial court "committed harmful error by admitting an unduly suggestive photo array" over his objection.

## III. Legal Sufficiency

In his first issue, Shoetan asserts that the evidence was legally insufficient for the jury to convict him of aggravated kidnapping. Specifically, he argues there was no proof he intentionally or knowingly abducted R.R. with the intent to violate or abuse her sexually.

### A. Standard of review

When performing a legal sufficiency review, we examine the evidence in the light most favorable to the verdict and determine if any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Alfaro-Jimenez v. State*, 577 S.W.3d 240, 243–44 (Tex. Crim. App. 2019). Circumstantial evidence is as probative of direct evidence in establishing the guilt of the defendant and

6

circumstantial evidence, by itself, may be enough to establish guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013). We measure the sufficiency of the evidence against the "hypothetically-correct jury charge, defined by the statutory elements as modified by the charging instrument." *Edwards v. State*, 666 S.W.3d 571, 574–75 (Tex. Crim. App. 2023) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)).

Our analysis considers all the evidence included in the appellate record. *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020). The factfinder is the sole judge of "the credibility and weight to be attached to the testimony of witnesses." *Dunham v. State*, 666 S.W.3d 477, 482 (Tex. Crim. App. 2023); *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014). If the record supports conflicting inferences, we presume the jury resolved the conflict in favor of the verdict, and we defer to that determination. *Dunham*, 666 S.W.3d at 482. "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Dobbs*, 434 S.W.3d at 170 (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)).

**B. Applicable law**

As relevant here, a person commits the offense of aggravated kidnapping if he intentionally or knowingly abducts another person with the intent to violate or abuse her sexually. Tex. Pen. Code. § 20.04(a)(4). A defendant acts intentionally "when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 6.03(a). A defendant acts knowingly "when he is aware of the nature of his conduct or that the circumstances exist" and "with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.* § 6.03(b). Abduct means "to restrain a person with the intent to prevent [her] liberation by: (A) secreting or holding [her] in a place where [she] is not likely to be found; or (B) using or threatening

7

to use deadly force." *Id*. § 20.01(2). Restrain means "to restrict a person's movements without consent, so as to interfere substantially with [her] liberty, by moving [her] from one place to another or by confining [her.]" *Id*. § 20.01(1). Restraint is "without consent" if it is accompanied by force, intimidation, or deception. *Id*. § 20.01(1)(A).

**C. Analysis**

Focusing narrowly on the abduction element of the aggravated kidnapping charge, Shoetan argues there was no evidence that he formulated any intent to secrete or hold R.R. in a location that she was unlikely to be found. He maintains R.R.'s testimony failed to show he conveyed any intent that she be hidden or not found. He points out that he parked at an apartment complex which was not an isolated area, they both had cell phones on them, and the Lyft app actively tracked his location. Even assuming the jury believed R.R.'s testimony that he made unwanted sexual advances towards her, Shoetan asserts that contrary to establishing his intent to secrete or hold her in a place she was unlikely to be found, the evidence in fact established he drove her to her workplace, as she requested.

To prove the element of abduction, the State must show that the defendant restrained another (actus reas) and had the specific intent to prevent liberation (mens rea). *Laster v. State*, 275 S.W.3d 512, 521 (Tex. Crim. App. 2009). "The offense of kidnapping is legally completed when the defendant, at any time during the restraint, forms the intent to prevent liberation by secreting or holding another in a place unlikely to be found." *Laster*, 275 S.W.3d at 521. The factfinder can infer intent from the defendant's conduct, remarks, and the circumstances. *See Turner v. State*, 600 S.W.2d 927, 929 (Tex. Crim. App. [Panel Op.] 1980). The intent to prevent liberation by secreting or holding "can be inferred when a victim is held in an automobile being driven on city streets." *Templeton v. State*, No. 08-16-00018-CR, 2019 WL 1785476, at *7 (Tex. App.—El Paso Apr. 24,

8

2019, no pet.) (not designated for publication) (quoting *West v. State*, 406 S.W.3d 748, 759 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd). Additionally, "restraining the complainant inside a vehicle and driving on public roads is not necessarily incompatible with an intent to prevent liberation by secreting or holding her in a place where she is not likely to be found." *Romero v. State*, No. 05-23-00689-CR, 2025 WL 992710, at *5 (Tex. App.—Dallas April 2, 2025, pet. ref'd) (mem. op. not designated for publication) (citing *Fann v. State*, 696 S.W.2d 575, 576 (Tex. Crim. App. 1985). The fact that an abduction took place in public does not prevent a jury from concluding that the defendant intended to secrete or hold the complaining witness in a place where she was not likely to be found. *See Falcon v. State*, No. 13-19-00264-CR, 2021 WL 1567751, at *4 (Tex. App.—Corpus Christi Apr. 22, 2021, no pet.) (mem. op., not designated for publication) (citing *Laster*, 275 S.W.3d at 523). The secreting element can also be proven by showing the defendant isolated the complainant from anyone who might be able to assist. *Megas v. State*, 68 S.W.3d 234, 240 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd).

Here, there was evidence that R.R. was locked inside of Shoetan's vehicle for the duration of the ride, he refused to unlock the door, and he refused to take her to work against her instructions. Shoetan told R.R. that the only way for her to get out was to get into the front seat. She testified that Shoetan drove her past the Sonic and into the Milan apartment complex, which was unfamiliar to her. R.R. testified that when they arrived at that location, she did not see any other people around and he parked in a shaded area towards the back. Shoetan grabbed R.R.'s phone and kept it from her during the ride and only returned it later, after they arrived at Sonic. Once he parked the vehicle at the apartment complex, Shoetan forcibly touched and violated R.R.'s body against her consent. Also, against her will, he grabbed her hand and made her touch his sexual organ.

On these facts, a reasonable jury could have found the element of abduction was proven beyond a reasonable doubt. *See Megas*, 68 S.W.3d at 240 (holding evidence that defendant forced complainant into the car after a witness attempted to render aid supported a finding that defendant intended to secrete or hold the complainant in a place where she was not likely to be found because defendant isolated the complainant from contacting anyone who might have been of assistance); *Templeton*, 2019 WL 1785476, at *7 (finding sufficient evidence when defendant drove past location complaining witness gave him and he drove in a way that prevented her from getting out of the vehicle).

We overrule Shoetan's first issue.

## IV. DOUBLE JEOPARDY

In his second issue, Shoetan contends his conviction and sentence for both attempted sexual assault and aggravated kidnapping violated principles of double jeopardy. As charged in the indictment, he maintains the attempted sexual assault charge is a lesser-included offense of the aggravated kidnapping charge and thus it is subsumed by the greater offense.

### A. Applicable law

Shoetan did not raise a double jeopardy complaint before the trial court. *See* Tex. R. App. P. 33.1(a). Nevertheless, a double jeopardy claim that is apparent on the face of the record may be raised for the first time on appeal when enforcement of usual rules of procedural default serves no legitimate state interest. *Langs v. State*, 183 S.W.3d 680, 687 (Tex. Crim. App. 2006) (discussing fundamental nature of double-jeopardy violations (quoting *Gonzalez v. State*, 8 S.W.3d 640, 643 (Tex. Crim. App. 2000))). "A double-jeopardy claim is apparent on the face of the trial record if resolution of the claim does not require further proceedings for the purpose of introducing

additional evidence in support of the double-jeopardy claim." *Ex parte Denton*, 399 S.W.3d 540, 544 (Tex. Crim. App. 2013).

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, protects an accused against a second prosecution for the same offense for which he has previously been acquitted or convicted, and also protects him from being punished more than once for the same offense. *Brown v. Ohio*, 432 U.S. 161, 165 (1977); *Littrell v. State*, 271 S.W.3d 273, 275 (Tex. Crim. App. 2008). The safeguards of double jeopardy protect against three distinct scenarios: (1) prosecution for a second time after the same offense after an acquittal; (2) prosecution for a second time for the same offense after a conviction; and (3) multiple punishments for the same offense. *Nawaz v. State*, 663 S.W.3d 739, 743 (Tex. Crim. App. 2022). Shoetan maintains the third scenario is relevant here.

To determine whether multiple punishments violate the Double Jeopardy Clause, we look only "to the pleadings and the relevant statutory provisions[,]" not "the evidence presented at trial." *Ex parte Benson*, 459 S.W.3d 67, 73 (Tex. Crim. App. 2015). To determine whether jeopardy attaches, we apply the "same-elements" test and determine whether each offense contains an element not contained in the other. *See Blockburger v. United States*, 284 U.S. 299, 304 (1932); *Watson v. State*, 900 S.W.2d 60, 61–62 (Tex. Crim. App. 1995) (en banc). If the second offense contains an element not found in the first offense, then double jeopardy protections are not violated. *Watson*, 900 S.W.2d at 61.

The *Blockburger* same-element test "asks 'whether each [offense] requires proof of a fact which the other does not.'" *Benson*, 459 S.W.3d at 72 (citing *Blockburger*, 284 U.S. at 304). When applying *Blockburger*, we deploy the cognate-pleadings approach, which requires that we compare the elements of the greater offense as pleaded to the statutory elements of the lesser offense. *Id.*

11

"If the two offenses, so compared, have the same elements, then 'a judicial presumption arises that the offenses are the same for purposes of double jeopardy' and that the defendant may not be punished for both, but that presumption can be rebutted by a clearly expressed legislative intent to impose multiple punishments." *Id*. If the two offenses display different elements under *Blockburger*, there is a judicial presumption that the offenses are different for double jeopardy purposes permitting punishment for both. *Id*. That presumption can be refuted by a showing, through various factors, that the legislature "'clearly intended only one' punishment." *Id*. (quoting *Price v. State*, 434 S.W.3d 601, 609–10 (Tex. Crim. App. 2014)).

The Court of Criminal Appeals has established a list of non-exclusive factors that courts must consider to determine if the legislature intended only one punishment for offenses that contain different elements under *Blockburger*: (1) whether the offenses are in the same statutory section; (2) whether the offenses are phrased in the alternative; (3) whether the offenses are named similarly; (4) whether the offenses have common punishment ranges; (5) whether the offenses have a common focus or gravamen; (6) whether the common focus tends to indicate a single instance of conduct; (7) whether the elements that differ between the two offenses can be considered the same under an imputed theory of liability that would render them the same under *Blockburger*; and (8) whether there is legislative history that contains an articulation of an intent to treat the offenses as the same or different for double jeopardy purposes. *Id*. at 72–73 (citing *Ex parte Ervin*, 991 S.W.2d 804, 814 (Tex. Crim. App. 1999)). Moreover, the high court has noted that it "has given more weight to the fifth and sixth factors, which, in combination, require that we examine the focus or gravamen of each offense and compare the resulting allowable unit of prosecution." *Id*. at 73; *see Garfias*, 424 S.W.3d at 59 ("We have indicated that the 'focus' or 'gravamen' of a penal provision should be regarded as the best indicator of legislative intent when

12

determining whether a multiple-punishments violation has occurred."). Even though the allowable unit of prosecution determination is usually part of a separate "units" analysis, we are permitted to consider the unit of prosecution even as part of the "elements" analysis, which aids us in ascertaining legislative intent. *Benson*, 459 S.W.3d at 73.

### B. Analysis

Here, the charge of aggravated kidnapping involved both an intent to violate or sexually abuse the victim and an intent to abduct. Conversely, the charge of attempted sexual assault required proof that Shoetan performed "an act that amounted to more than mere preparation that tended but failed to effect the commission of Sexual Assault" and that Shoetan "had the specific intent to commit the offense of Sexual Assault." Therefore, proving aggravated kidnapping required proof of an element, abduction, that attempted sexual assault did not require, and proving attempted sexual assault required proof of an element, an act amounting to more than mere preparation, that aggravated kidnapping did not require. This satisfies the *Blockburger* test and we continue to the *Ervin* factors. *Philmon v. State*, 609 S.W.3d 532, 536 (Tex. Crim. App. 2020) ("Once a presumption is raised that count one and count two are different offenses under the *Blockburger* 'same-elements' test, we consider a non-exclusive set of factors we listed in *Ex parte Ervin.*").

Aggravated kidnapping and attempted sexual assault are in different statutory chapters and sections of the penal code. *See* Tex. Pen. Code §§ 20.04, 22.011, 15.01. The two offenses are neither phrased in the alternative nor similarly named. *Id.* §§ 20.04, 22.11. They also have differing punishment ranges. An aggravated kidnapping is classified as a first-degree felony and an attempted sexual assault is a third-degree felony. *See id.* § 20.04(c) (providing the offense is a

felony of the first degree); 22.011(f) (providing the offense is a felony of the second degree); 15.01(d) (providing an offense under this section is one category lower than the offense attempted).

Additionally, the two offenses have different gravamina. For aggravated kidnapping, the gravamen of the offense is abduction. *Schweinle v. State*, 915 S.W.2d 17, 19 n.2 (Tex. Crim. App. 1996) (en banc)) (per curiam). Conversely, the gravamen of the offense of attempted sexual assault is penetration or contact with an orifice or sexual organ. *Jourdan v. State*, 428 S.W.3d 86, 96 (Tex. Crim. App. 2014) (analyzing analogous provisions of aggravated-sexual-assault statute); *see also Ex parte Milner*, 394 S.W.3d 502, 508–09 (Tex. Crim. App. 2013) (finding that criminal-attempt offenses acquire their allowable unit of prosecution from the offense attempted). The two statutes address different instances of conduct, abduction versus contact with a sexual organ, and cannot be considered the same under an imputed-elements *Blockburger* standard because they "are not at all related." *See Philmon*, 609 S.W.3d at 540; *Aguilar-Estrada v. State*, No. 03-19-00064-CR, 2021 WL 4954346, at *4 (Tex. App.—Austin Oct. 26, 2021, no pet.) (mem. op., not designated for publication) (finding convictions for both aggravated kidnapping and sexual assault did not violate double-jeopardy). Finally, Shoetan does not provide, and we have not discovered in our independent review, any legislative history containing an articulation of an intent to treat the offenses as the same or as different for double jeopardy purposes. *Aguilar-Estrada*, 2021 WL 4954346, at *4 (providing no legislative history explicitly suggested that aggravated kidnapping and sexual assault should or should not be considered the same offense); *cf. Llorens v. State*, 520 S.W.3d 129, 140 (Tex. App.—Austin 2017, pet. ref'd) (concluding that legislative history weighed in favor of a determination that the legislature intended for the offenses of kidnapping and interference with child custody to be treated as the same for double-jeopardy purposes because both bill analyses used the term "kidnapping" in reviewing the offenses).

Shoetan argues that the sexual assault offense was "subsumed" by the aggravated kidnapping charge. He asserts that the two offenses merged because his "course of conduct was one continuous act with a single impulse." *See Aekins v. State*, 447 S.W.3d 270, 280 (Tex. Crim. App. 2014) ("Where two crimes are such that the one cannot be committed without necessarily committing the other, then they stand in the relationship of greater and lesser offenses, and the defendant cannot be convicted or punished for both."). We reject Shoetan's complaints for two reasons. First, courts have rejected a double jeopardy challenge when sexual assault serves as the aggravating element of the kidnapping charge. *See Gonzales v. State*, 270 S.W.3d 282, 285 (Tex. App.—Amarillo 2008, pet. ref'd) (concluding that convictions for both aggravated sexual assault and aggravated kidnapping was not a violation of double jeopardy even if one count of the indictment referred to sexual assault as an aggravating factor of aggravated kidnapping). Second, the merger doctrine is inapplicable here because "[t]he offense of kidnapping is legally completed when the defendant, at any time during the restraint, forms the intent to prevent liberation by secreting or holding another in a place unlikely to be found." *Laster*, 275 S.W.3d at 521. Shoetan could have completed the aggravated kidnapping prior to performing the attempted sexual assault. *Id.* It does not follow that the aggravated kidnapping could not have been completed without also committing a sexual assault.

In total, the weight of all the factors favors a determination that a multiple-punishments violation did not occur.

We overrule Shoetan's second issue.

## V. VOLUNTARY RELEASE IN A SAFE PLACE

In his third issue, Shoetan complains that, based on the legal and factual sufficiency of the evidence, the trial court erred by denying his request for a finding that he voluntarily released R.R.

15

in a safe place, which would have reduced the punishment range from first to second degree punishment.

At the conclusion of the punishment hearing, the trial court held that "based on the totality of factors, [] there are three factors that give me a reason to find against the safe release argument." The factors listed included: (1) that Shoetan knew where R.R. lived given he acted as her rideshare driver, (2) she left her keys behind in his vehicle, and (3) he indicated he had plans on returning as he talked about her making him wait until Sunday.

## A. Applicable law and standard of review

Aggravated kidnapping is a first-degree felony punishable by a term of imprisonment for five to 99 years or life. Tex. Penal Code § 20.04(c), 12.32(a). "At the punishment stage of a trial, the defendant may raise the issue as to whether he voluntarily released the victim in a safe place. If the defendant proves the issue in the affirmative by a preponderance of the evidence, the offense is a felony of the second degree." *Id*. § 20.04(d). A second-degree felony is punishable by a term of imprisonment between two and 20 years. *Id*. § 12.33(a).

A defendant is required to prove voluntary release in a safe place by a preponderance of the evidence, a lesser standard of proof than is required during the guilt-innocence phase of a criminal trial. *See Hacker v. State*, 389 S.W.3d 860, 865 (Tex. Crim. App. 2013). The defendant must create, by the greater weight of the credible evidence, a reasonable belief that the defendant voluntarily released the victim in a safe place. *See Scamardo v. State*, 517 S.W.2d 293, 298 (Tex. Crim. App. 1974).

"Affirmative defenses may be evaluated for legal and factual sufficiency[.]" *See Butcher v. State*, 454 S.W.3d 13, 20 (Tex. Crim. App. 2015). "In a legal-sufficiency review of an affirmative defense, reviewing courts should first assay the record for a scintilla of evidence favorable to the

factfinder's finding and disregard all evidence to the contrary unless a reasonable factfinder could not. *Id*. (citing *Matlock v. State*, 392 S.W.3d 662, 669–70 (Tex. Crim. App. 2013)). The finding of the factfinder rejecting a defendant's affirmative defense should be overturned for lack of legal sufficiency only if the appealing party establishes that the evidence conclusively proves his affirmative defense, and "no reasonable [factfinder] was free to think otherwise." *Id*. (citing *Matlock*, 392 S.W.3d at 670). "In a factual-sufficiency review of a finding rejecting an affirmative defense, and unlike in a legal-sufficiency review, courts examine the evidence in a neutral light." *Id*. (citing *Matlock*, 392 S.W.3d at 671). "A finding rejecting a defendant's affirmative defense cannot be overruled unless, 'after setting out the relevant evidence supporting the verdict, the court clearly states why the verdict is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased.'" *Id*. (quoting *Matlock*, 392 S.W.3d at 671).

Section 20.04 requires proof of the accused "perform[ing] 'some overt and affirmative act' which brought home to his victim that she had been 'fully released from captivity.'" *Dominguez v. State*, 467 S.W.3d 521, 527 (Tex. App.—San Antonio 2015, pet. ref'd) (quoting *Harrel v. State*, 65 S.W.3d 768, 772 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd)). The release "must have occurred in a place and manner which realistically conveyed to the [complaining witness] that she was then freed from captivity and in circumstances and surroundings wherein aid was readily available." *Id*. at 527–28. The term "voluntarily," which appears in § 20.04(d), is interpreted narrowly to mean the absence of "'rescue by the police [or others] or escape by the [kidnap] victim.'" *Brown v. State*, 98 S.W.3d 180, 188 (Tex. Crim. App. 2003). Factors to consider in determining whether the defendant released the victim in a safe place include: (1) the remoteness of the location; (2) the proximity of authorities or persons who could aid or assist; (3) the time of day; (4) climatic conditions; (5) the condition of the victim; (6) the character of the location or

17

surrounding neighborhood; and (7) the victim's familiarity with the location or surrounding neighborhood. *Woods*, 301 S.W.3d at 331–32.

### B. Analysis

We begin with an examination of whether the evidence established Shoetan voluntarily released R.R. She testified he eventually drove her to Sonic, her intended destination. Once there, he unlocked the doors, gave her back her phone, and told her "you can leave now" after demanding and confirming her phone number. The State argues that Shoetan failed to create a reasonable belief that he voluntarily released R.R. because there was no "overt and affirmative act" of him informing her that she was fully released from captivity. Although the State acknowledges that R.R. testified that Shoetan told her "you can leave now" once she gave him her phone number, it argues the evidence was, at most, ambiguous.

The Court of Criminal Appeals has concluded that a narrow interpretation of the term "voluntarily" is likely to effectuate and serve the legislative purpose of § 20.04(d), i.e., to encourage those who kidnap to release their victims. *Brown*, 98 S.W.3d at 188. Under this narrow interpretation, a kidnap victim is deemed to have been "voluntarily" released in "the absence 'of rescue by the police [or others] or escape by the [kidnap] victim.'" *Id*. Neither of these circumstances are shown by the record before us. We conclude there was sufficient evidence of record to establish that Shoetan voluntarily released R.R.

As for whether the evidence established that Shoetan released R.R. to a safe place, the Court of Criminal Appeals has held that there is no one definition for this term. Using the non-exhaustive list of factors, the evidence established that Shoetan drove R.R. to Sonic, her regular workplace, and she was familiar with the area. It was still daylight when he dropped her off and it was not in a remote location. After R.R. exited the vehicle, she immediately went to speak with

18

her friend. Although she was distraught and shaken, R.R. was not prevented from seeking aid and assistance. Her friend comforted R.R. and called law enforcement.

The State argues that sufficient evidence supported the trial court's rejection of Shoetan's safe-place defense. It points out that the record established that Shoetan knew where R.R. lived, her keys were likely left in his van, and that he told her he would see her on Sunday. The State argues this evidence sufficiently refutes his claim that he released R.R. in a "safe place." We have found no authority holding that a threat of future harm at one location could otherwise render a different drop-off location unsafe. We decline to interpret "safe place" in such a manner and conclude the trial court's cited factors did not make R.R.'s workplace an unsafe place. *See Lavarry v. State*, 936 S.W.2d 690, 696 (Tex. App.—Dallas 1996, pet. dism'd) (holding State's argument that defendant threatened to hurt victim if she called the police was an argument that focused on the "dangerousness of the defendant and the victim's feelings of safety, or lack thereof, instead of the safety of the *place* of release").

We conclude the evidence is insufficient to support the trial court's finding that Shoetan did not voluntarily release R.R. to a safe place. We sustain Shoetan's third issue.

## VI. THE PHOTO ARRAY

In his final issue, Shoetan contends the trial court violated his due process rights by admitting an "unduly suggestive" photo array. Specifically, he argues the array subjects were dissimilar in appearance from him and some men looked younger than others. He argues the array itself was suggestive and gave rise to a likelihood of misidentification.

### A. Applicable law

"[A] pre-trial identification procedure may be so suggestive and conductive to mistaken identification that subsequent use of that identification at trial would deny the accused due process

of law." *Barley v. State*, 906 S.W.2d 27, 32–33 (Tex. Crim. App. 1995) (en banc). A photo array may be impermissibly suggestive in the way in which it is presented to the witness or due to the content of the array itself. *Id.* at 33. As to content, an array "may be impermissibly suggestive if the suspect is the only individual in the array who closely resembles the pre-procedure description." *Balderas*, 517 S.W.3d at 794. When a defendant argues the content of the array itself was impermissibly suggestive on its face and his challenge does not turn on witness credibility, we review the issue of suggestiveness de novo. *Colgin v. State*, 132 S.W.3d 526, 531–32 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd); *see also Gamboa v. State*, 296 S.W.3d 574, 581 (Tex. Crim. App. 2009) (reviewing de novo ruling on how suggestiveness of photo array may have influenced in-court identification).

In doing so, we engage in a two-step process. First, we determine whether the pretrial identification procedure was impermissibly suggestive. If we conclude that it was, we then determine whether the impermissibly suggestive nature of the pretrial identification gave rise to a "very substantial likelihood of irreparable misidentification." *Delk v. State*, 855 S.W.2d 700, 706 (Tex. Crim. App. 1993) (en banc); *Nunez-Marquez*, 501 S.W.3d at 235; *Burkett v. State*, 127 S.W.3d 83, 86 (Tex. App.—Houston [1st Dist.] 2003, no pet.). "It is the appellant's burden to prove the in-court identification is unreliable by proving both of these elements by clear and convincing evidence." *Santos v. State*, 116 S.W.3d 447, 451 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd).

## A. Analysis

Assuming without deciding that the trial court erred in admitting the lineup, any error was harmless. *See* Tex. R. App. P. 44.2(a) (explaining that for constitutional error, the court must reverse a judgment of conviction or punishment unless it determines beyond a reasonable doubt

that the error did not contribute to the conviction or punishment); *Martinez v. State*, 689 S.W.3d 30, 46–47 (Tex. App.—Fort Worth 2024, pet. ref'd) (holding that overwhelming evidence connecting defendant to the offense made any error in admitting a photo lineup harmless); *Tillman v. State*, 376 S.W.3d 188, 202 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd) (explaining that the constitutional-harm analysis should focus not on the propriety of the trial's outcome but rather on the probable impact on the jury in light of the existence of other evidence, with the record viewed in a neutral, impartial, and even-handed manner).

There was overwhelming evidence tying Shoetan to the offense. The State admitted photos from R.R.'s Lyft app showing Shoetan as her driver and matching the photo provided by Lyft. Additionally, the Lyft records confirmed that Shoetan drove a white Toyota Sienna van that matched the description of the vehicle that R.R. gave and which matched the one captured by Sonic surveillance footage prior to R.R.'s drop off at the Sonic. In addition, the Lyft geolocation data aligns with the progression of events from when the ride began at R.R.'s apartment and which ended at the Milan apartment complex.

We conclude that any error in admitting the photo lineup in this case was harmless. *See Martinez v. State*, 689 S.W.3d 30, 47 (Tex. App.—Fort Worth 2024, pet. ref'd) (holding admission of photo lineup was harmless in light of independently secured evidence of defendant's identity); *Tillman*, 376 S.W.3d at 202 ("The presence of overwhelming evidence supporting the finding in question can be a factor in the evaluation of harmless error under Rule 44.2(a)."). We overrule Shoetan's fourth issue.

## VII. CONCLUSION

We affirm the judgment of conviction for attempt to commit sexual assault. We affirm in part the judgment of conviction for aggravated kidnapping, and reverse and remand for a new punishment hearing.


GINA M. PALAFOX, Justice


July 20, 2026

Before Salas Mendoza, C.J., Palafox and Soto, JJ.

(Do Not Publish)

22